CAUSE NO. 2014-68677

| | | |
|---|---|---|
| FLORIDA GAS TRANSMISSION COMPANY, LLC, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| FCC ENVIRONMENTAL, LLC, | § § § | |
| Defendant and Third-Party Plaintiff. | § § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § § § | |
| ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY, | § § § § | |
| Third-Party Defendant. | § | 11TH JUDICIAL DISTRICT |

## PLAINTIFF'S SECOND AMENDED PETITION

Plaintiff Florida Gas Transmission Company, LLC ("*FGT*") files its Second Amended Petition against FCC Environmental, LLC ("*FCC*"), and in addition to the causes of action set forth herein, petitions this Court pursuant to the Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice & Remedies Code.  In support of its petition, FGT respectfully shows the Court as follows:

### I.
### SUMMARY OF LAWSUIT

1.      FGT files this lawsuit seeking damages arising from multiple breaches of an Environmental Services Agreement, effective April 1, 2003[1] (as amended, the "*Agreement*" or

---

[1] A true and correct copy of the Agreement, as amended, is attached hereto as **EXHIBIT 1**.

The Agreement was originally executed between Florida Gas Transmission Company and U.S. Filter Recovery Services (Mid-Atlantic), Inc., effective April 1, 2003.

Plaintiff is the successor to Florida Gas Transmission Company.



"*ESA*"), between FGT and FCC (collectively, the "*Parties*"), as well as FCC's breach of a later written agreement between FCC and FGT whereby FCC agreed to notify all insurance carriers of the underlying *Villegas* lawsuit, and demand a defense of that lawsuit on behalf of FGT (the "*Notice Agreement*").

2.      FGT also seeks damages related to FCC's tortious interference with FGT's insurance contracts, and FCC's breaches of fiduciary duties arising from the Notice Agreement.

3.      Lastly, FGT seeks a declaratory judgment that FCC is required to defend and indemnify FGT from any liability and third-party claims arising from "Work" performed by FCC under the Parties' Agreement effective April 1, 2003; that the Work performed by FCC for FGT and which led to an accident and alleged personal injuries to Oscar Villegas arises from Work performed pursuant to the Agreement; and therefore that FCC is required to defend, indemnify, and hold FGT harmless in a lawsuit filed by Oscar Villegas pursuant to the Agreement.

4.      FGT is entitled to damages, including its defense costs and settlement proceeds from the underlying *Villegas* suit; exemplary damages pursuant to Texas Civil Practice & Procedure Code § 41.003(a); the declarations sought; and attorneys' fees and costs it has incurred and will incur in this dispute pursuant to common law as well as Chapters 37 and 38 of the Texas Civil Practice & Remedies Code.

## II.
## DISCOVERY CONTROL PLAN

5.      FGT believes that discovery should be conducted in accordance with the Level 3 Discovery Control Plan, as set forth in Texas Rule of Civil Procedure 190.4.

---

Defendant is the successor to U.S. Filter Recovery Services (Mid-Atlantic), Inc. Specifically, U.S. Filter Recovery Services (Mid-Atlantic), Inc. changed its legal name to Siemens Water Technologies Corp. in August 2006. Hydrocarbon Recovery Services, Inc. d/b/a FCC Environmental acquired Siemens on February 29, 2008. Defendant FCC Environmental, LLC is the surviving entity following a merger with Hydrocarbon Recovery Services, Inc. on or about July 13, 2010. Following a Stock Purchase Agreement in October of 2014, Defendant is currently owned by a company called Heritage-Crystal Clean, Inc. ("*Heritage*").

---

### III.
### PARTIES

6.      Plaintiff FGT is a limited liability company organized under the laws of the State of Delaware.  FGT is duly licensed to do business in Texas and maintains a principal place of business at 1300 Main St., Houston, Texas 77002.

7.      Defendant FCC is a limited liability company organized under the laws of the State of Delaware.  FCC is duly licensed to do business in Texas.  FCC has entered an appearance in this lawsuit, and is properly before the Court for all purposes.

### IV.
### JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to § 37.001 of the Texas Civil Practice and Remedies Code.  The amount in controversy exceeds the minimum jurisdictional limits of this Court.  The Court has jurisdiction over FCC because it is a limited liability company with its principal place of business in Texas.

9.      Venue is proper in Harris County, Texas pursuant to Texas Civil Practice and Remedies Code § 15.002(a)(3) because defendant FCC's principal office in Texas is located in Harris County.

10.     Venue is also proper in Harris County, Texas pursuant to the terms of the Agreement, which states that "[v]enue shall be proper in Harris County." *Agreement* at 26, § 32.

### V.
### FACTUAL BACKGROUND

*A.      FGT and FCC*

11.     FGT operates an approximately 5,500-mile natural gas pipeline system, providing natural gas transportation services to over 250 delivery points.  FGT purchases, transmits, sells, and transports natural gas from Texas, Louisiana, Mississippi, and Florida.  When FGT's

pipeline needs service or maintenance, FGT solicits sophisticated service companies like FCC to provide maintenance, repair, and other services. FGT and those service companies often enter into agreements concerning the long-term provision of services.

12.     According to its prior website (taken down since FGT initiated this litigation), FCC is one of the world's largest environmental service companies, serving over 30,000 customers throughout the United States. FCC performs a variety of maintenance and repair services on-site, including industrial services, pipeline services, tank cleaning, and hazardous waste transportation and treatment. To this day, FCC and/or its successor company offers "Environmental Services" and "Oil Collection Services" to its thousands of customers. To do so, FCC uses its "fleet of oil tank trucks to collect and remove used oil and oily water for recycling and disposal, respectively."

13.     FCC and FGT are parties to an Environmental Services Agreement (referenced above) whereby FCC agreed to, among other things, perform those exact services—frac tank cleaning and transportation services defined as "Work" under the Parties' Agreement.

**B.     *FGT requested, and FCC agreed to perform, "Work" under the Parties' ESA***

14.     In May 2012, FGT needed to replace a valve on a section of its pipeline near Port Lavaca, Texas. To replace the valve, FGT would need to "blow down" a section of its pipeline to remove any contents before performing tasks such as welding. As part of these "blow down" operations, FGT needed to use a receptacle known in the oil industry as a "frac tank" to collect potential residual liquids that occasionally remain in a pipeline after evacuating the pipeline.

15.     Pursuant to the terms of the Parties' Agreement, FGT contacted FCC and requested a frac tank and cleaning services. FCC agreed to perform the Work, as it had numerous times before. FGT then cooperated with FCC to schedule the Work. Ultimately, FCC

arranged both for the delivery of the frac tank to the FGT job site outside Port Lavaca, Texas, and also for the cleaning of the frac tank once it was removed from FGT's job site.

### C.     FCC performs "Work" under the Parties' Agreement

16.     Upon information and belief, FCC, or otherwise its agents and/or sub-contractors, including a company called Vann Energy Services, LLC ("*Vann Energy*"), performed the Work at issue.  FCC, or otherwise its agents or sub-contractors, delivered the frac tank to FGT's premises.  After FGT completed its blow down operations, FGT again contacted FCC, and the frac tank was transported by either FCC or its agents and/or sub-contractors to a yard near Nixon, Texas for cleaning.

### D.     The Accident, the Villegas Lawsuit, and FGT's request for indemnity under the Agreement

17.     A Vann Energy employee, Oscar Villegas, was allegedly injured when an explosion occurred while Villegas was cleaning a frac tank (the "*Accident*") at Vann Energy's yard near Nixon, Texas.  Thereafter, Villegas named FGT and FCC as defendants in a lawsuit seeking personal injury damages in Cause No. 2014-16939, *Oscar Villegas v. Florida Gas Transmission Company, LLC, APEX/FCC, LLC and FCC Environmental, LLC*, now pending in the 270th Judicial District Court of Harris County, Texas (the "*Villegas Suit*").[2]  As was clear from the face of the pleadings, the Accident and the Villegas Suit arise from Work performed under the Agreement.

18.     The ESA requires FCC to defend and indemnify FGT for claims arising out of or incident to the negligent performance of the Agreement or any "Work" performed by FCC under

---

[2] Court records indicate that although Villegas named FCC Environmental as a party to the Villegas Suit, he never perfected service of a citation upon FCC Environmental.

the Agreement.  *Agreement* at 19-21, § 18.  In pertinent part, Section 18(a) of the Agreement

provides:

> To The Fullest Extent Permitted By Law, [FCC] agrees to *indemnify, release, defend and hold harmless [FGT] . . . from and against any and all claims, demands, losses, damages, causes of action, suits and liabilities of every kind, including . . . [r]easonable expenses of investigation, litigation, court costs, and attorneys' or consultants' fees, for injury to or death of any person, or for loss or damage to any property . . . to the extent such claims arise out of or [are] in any way incidental to the negligent performance of this Agreement or <u>any Work performed hereunder by [FCC]</u>* (collectively "Liabilities"), [t]his indemnity includes [FCC's] agreement to pay all reasonable costs and expenses of defense, including without limitation attorneys' fees, incurred by [FGT].

*Agreement* at 19–20, § 18(a) (emphasis added).  Section 18(c) states:

> It is understood and agreed by [FCC] that in the event [FGT] is made a defendant in any suit, action or proceeding for which it is indemnified pursuant to this Agreement ("Claim"), and [FCC] fails or refuses to assume the defense thereof, after having been notified by [FGT] to do so, that [FGT] may compromise and settle or defend any such Claim, and [FCC] shall be bound and obligated to reimburse said [FGT] for the amount expended by [FGT] in settling and compromising any such Claim, or for the amount expended by [FGT] in paying any judgment rendered therein, together with all reasonable attorneys' fees incurred by [FGT] for defense or settlement of such Claim.  Any judgment rendered against [FGT] or amount expended by [FGT] in compromising or settling such claim shall be conclusive as determining the amount for which [FCC] is liable to reimburse [FGT] hereunder.

*Agreement* at 20–21, § 18(c).

Lastly, with respect to sub-contractors, Section 34 of the Agreement states the following:

> [FCC] shall further cause each subcontractor to assume and satisfy all obligations of [FCC] hereunder to the full extent same may be applicable to the portions of the Work subcontracted.  [FCC] shall be liable for all acts and omissions of any assignee, subcontractor, or any of their employees or agents, *as if performed or omitted by Contractor*.

*Agreement* at 26, § 34 (emphasis added).

19.     Although FGT asserts that Mr. Villegas' allegations are meritless, upon receipt of the Villegas Suit, FGT promptly notified FCC of same, and demanded a defense and indemnity as provided for under the above provisions of the parties' ESA.

20.     FCC refused to defend or indemnify FGT in the Villegas Suit for the reasons set forth below.  After the Accident, for the very first time, FCC adopted the "new" position that it did not provide the frac tank and cleaning services under the Parties' Agreement.  Rather, FCC now asserts that its affiliate and/or subsidiary company, APEX/FCC, LLC ("*APEX/FCC*"), provided the frac tank (but not cleaning services) to FGT, and only did so under a separate, oral, unsigned "lease" that did not contain any type of indemnity provision benefitting FGT with respect to the Accident, and that was only provided in draft form after the Accident.

21.     Whether FCC supplied the frac tank itself, or otherwise relied on its sub-contractors and/or sister company to do so, the frac tank and cleaning services were provided by FCC as "Work" pursuant to the Agreement.  Thus, in any case, FCC is obligated to defend and indemnify FGT for the accident which arose out of the "Work" FCC performed pursuant to the parties' Agreement.

*E.     APEX/FCC's Apparent Authority to Bind FCC under the Agreement with FGT*

22.     Pleading further, and in the alternative if necessary, FGT asserts that APEX/FCC is merely an "alter-ego" for FCC.  FGT's investigation reveals that APEX/FCC, LLC is a joint venture entered into by FCC and, upon information and belief, FCC owned a fifty-one percent (51%) share of APEX/FCC, LLC.  FCC controlled the operations of APEX/FCC by virtue of FCC employees who actively managed the business operations of APEX/FCC.  Further, FCC shared the exact same physical location, phone number, fax number, and, upon information and belief, employees as APEX/FCC.

---

23.     Assuming, purely for the sake of argument, that FCC's new positions have any merit at all (they do not), then APEX/FCC served as the agent for FCC.  Upon information and belief, FCC knowingly permitted APEX/FCC to hold itself out as having authority to act on behalf of FCC with respect to Work performed pursuant to the Agreement.  Specifically, FCC had knowledge (and intended) that APEX/FCC routinely held itself out to others as "FCC," and FCC referred FGT to APEX/FCC as part of FCC agreeing to perform the Work at issue in this lawsuit and in the Villegas Suit.

24.     Further in the alternative, FGT asserts that FCC acted with such a lack of ordinary care as to clothe APEX/FCC with the indicia of authority to perform Work under the Agreement at issue in this lawsuit such that the services provided by APEX/FCC, if any, constitute Work performed by FCC under the Parties' Agreement.  Specifically, FCC had actual knowledge that APEX/FCC held itself out to others as "FCC."  Indeed, agents and employees of APEX/FCC represented to FGT's employees that they were affiliated and/or employed by "FCC."

25.     FCC and/or APEX/FCC's conduct caused FGT, and likely countless other FCC customers, to reasonably believe that APEX/FCC had the authority to act on FCC's behalf, and therefore FGT's reliance on APEX/FCC's authority was justifiable.  A reasonably prudent person, standing in the shoes of FGT, would naturally and reasonably believe or suppose that APEX/FCC had authority to act on behalf of FCC, and that any Work APEX/FCC performed was done so pursuant to the terms of the Agreement between FGT and FCC.

26.     By virtue of FCC's position on the issue of defense and indemnity, FGT has changed its position to its detriment in reliance upon the representations made by both FCC and APEX/FCC.  Specifically, due to FGT's reliance on FCC's conduct, and upon APEX/FCC's

apparent authority to perform Work governed by the Agreement between FGT and FCC, FGT is now at risk of losing its right to a defense and indemnity over and against FCC.

27.     Further, upon information and belief, APEX/FCC no longer exists, or otherwise is no longer an operating entity, and thus FGT will be prejudiced in its ability to pursue any available remedies against APEX/FCC arising from the Accident or the Villegas Suit.

### F.     Despite FCC's Agreement to Demand a Defense and Indemnity from all Insurers on Behalf of FGT, Defendant Did Not Follow Through.

28.     Following FGT's demand for defense and indemnity sent to FCC, and after FGT sued FCC for refusing to do what it agreed to do under the ESA, FCC contacted FGT.  In exchange for FGT's cooperation with respect to deadlines in the present lawsuit, FCC entered into a written agreement whereby FCC agreed to "immediately demand a defense of FGT from FCC's and Heritage's insurance carriers in connection with the underlying litigation brought by Mr. Villegas."[3]

29.     Despite this agreement, FCC failed to request a defense of FGT at all.  Instead, FCC perpetuated the above charade involving APEX/FCC, only this time FCC argued these positions to insurance carriers.  In sum, FCC placed its own interests ahead of FGT in an apparent effort to, upon information and belief, "beat FGT to the punch" and demand that any insurance carriers protect FCC in the present lawsuit—not FGT in the Villegas lawsuit.

30.     FCC only notified one insurance carrier, Third-Party Defendant Endurance, about the present lawsuit between FGT and FCC.  FCC apparently never demanded a defense of FGT from Endurance or any other insurer "in connection with the underlying litigation brought by Mr. Villegas."  Indeed, while actively concealing the existence of an insurance policy that FCC now

---

[3] *Notice Agreement (**EXHIBIT 2**).*

insist provided coverage to FGT, FCC sat idly by and never even bothered to communicate with that insurer "in connection with the underlying litigation brought by Mr. Villegas."

31.    These actions are inexcusable, breached FCC's express written agreements with FGT, and resulted in substantial damages to FGT.

### G. FCC Interferes with FGT's Rights to Insurance Coverage

32.    If FCC was not going to honor its word, it should have told FGT.  That way, FGT could have tried to mitigate the damaging consequences of FCC's conduct.    Indeed, as referenced above, before FCC agreed to protect FGT's interests, FGT demanded—early and often—that FCC produce all certificates of insurance for any insurance policies that could provide coverage to FGT for the underlying Villegas Suit.  FCC failed to do so.

33.    On May 15, 2014—just days after service of the Villegas Suit—FGT immediately demanded "that FCC provide the Certificate(s) of Insurance for all policies of insurance naming FGT, its parent and Affilates, and their directors, officers, employees and agents, as Additional Insured."  In this manner, FGT could have secured not only the insurance policies secured by FCC, but also any insurance policies secured by sub-contractors such as APEX/FCC and Vann Energy.  FGT's simple requests were met with silence from FCC.  Even after FGT sued FCC to secure this crucial information, FCC still did not provide any applicable insurance policies in litigation or otherwise.

34.    Rather, aside from producing a seemingly irrelevant "environmental policy" that did not name FGT as an "Additional Insured" as required under the ESA, FCC merely "doubled down" on its position that FCC was not required to obtain any such insurance because FCC did not perform any Work for FGT.

35.     FCC continued this charade for nearly two years.   In the meantime, FGT vigorously defended and eventually settled the underlying Villegas Suit for a reasonable sum.

36.     More than two years after the above requests, nearly eighteen (18) months after suing FCC, and only after FGT settled the underlying Villegas Suit, FCC finally disclosed a Certificate of Insurance reflecting a Commercial General Liability Policy in effect on the date of the Accident and naming FGT as an Additional Insured (the "*Chartis Policy*").

37.     FCC now glibly argues the Chartis Policy absolves FCC from any liability under the insurance provisions of the ESA.   Shockingly, FCC was aware of the Chartis Policy in October 2014, but simply refused to disclose the Chartis Policy to FGT.   When FCC's failures were brought to light, FCC back-peddled, making the self-serving argument that FGT "should have known" of the policy and therefore FCC owed no duty to FGT to disclose it—despite the fact that FGT had begged for this information for years.

38.     To be clear: FGT learned in depositions that FCC did contact Chartis and Third-Party Defendant Endurance seeking defense and indemnity—**solely for the benefit of FCC in the present litigation**.   None of the correspondence between FCC and any insurance carriers contains a "demand [for] a defense of FGT … in connection with the underlying litigation brought by Mr. Villegas."   Rather, FCC was solely protecting its own interests in the present litigation.

39.     Furthermore, not only did FCC refuse to do what it promised, FCC went out of its way to virtually advocate against insurance coverage for FGT.   Specifically, in written letters to insurers, FCC regurgitated its position that FCC did not perform any Work for FGT under the ESA, and therefore prevented, or at best frustrated, FGT's right to assert its status as an "Additional Insured" under applicable insurance policies.

## VI.
## BREACH OF CONTRACT

40.     FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

41.     Two valid and enforceable contracts are now at issue in this lawsuit.  The ESA between FGT and FCC; and the Notice Agreement between FGT and FCC.

42.     FGT has at all times performed and satisfied its contractual obligations under the Parties' Notice Agreement and the ESA.  FCC materially breached the Parties' agreements, as set forth herein, causing damages which FGT is entitled to recover in the present lawsuit.

### A.      *FCC Breached the Notice Agreement by Failing or Refusing to Demand a Defense of FGT in Connection with the Villegas Suit.*

43.     FCC unequivocally agreed to demand a defense of FGT from insurance carriers in connection with the underlying Villegas Suit.  FCC agreed to do so on or before February 6, 2015.  FCC received good and valuable consideration in exchange for its promise to protect FGT, and FGT fully performed its obligations under the Notice Agreement.

44.     FCC breached the Notice Agreement by admittedly failing to demand a defense of FGT from any insurance carriers at all.

45.     Had FCC complied with its contractual obligations, the insurance policies would have potentially covered the damages sought in the Villegas Suit, as well as FGT's defense costs, given the allegations contained in the Villegas Suit.

46.     Therefore, FGT is entitled to recover damages that are the natural, probable, and foreseeable consequence of FCC' breach, which are the settlement proceeds ultimately paid by FGT to settle the underlying Villegas Suit, as well as FGT's defense costs in the Villegas Suit—the very losses the requisite insurance policies would have covered had FCC simply done what it said it would do.

**B.**      ***FCC failed to cause subcontractors or assignees to assume and satisfy its obligations under the Parties' Agreement.***

47.      By arguing that it did not perform the Work at issue in this lawsuit and the Villegas Suit, FCC virtually admits that it has breached Section 34 of the Parties' Agreement, requiring FCC to cause any subcontractor or assignee to assume and satisfy all indemnity and insurance obligations required under the Parties' Agreement.

48.      FCC failed to require APEX/FCC and/or Vann Energy to assume and satisfy those obligations, and thus left FGT exposed to liability in the Villegas Suit, as well as defense costs arising from the Villegas Suit.

**C.**      ***FCC failed to secure insurance coverage for FGT as required under the plain terms of the Parties' Agreement.***

49.      Section 21 of the Parties' ESA required FCC to procure certain insurance policies covering FGT for any liability arising from Work performed under the Parties' Agreement. *Agreement* at 21, ¶ 21. Specifically, the Agreement required FCC to procure at least two specific policies:

    a) One policy offering FGT primary coverage in the amount of $1,000,000 for bodily injury and property damage arising out of the Work; and

    b) An umbrella policy offering excess coverage in the amount of $1,000,000.

*Id.* at Exh. E. FCC did not purchase either.

50.      Upon information and belief, such insurance coverage had previously been secured by FCC for other Work performed under the Parties' Agreement. Therefore, although the insurance coverage required under the Parties' Agreement was, at least according to FCC's representations, actually available, FCC simply failed to renew and/or purchase appropriate insurance policies to govern the Work at issue in this lawsuit—despite its contractual agreement to do so.

51.     Pleading further and in the alternative if necessary, even if FCC purchased the required insurance policies (as it now argues for the first time after years of litigation), it nonetheless breached this provision of the Parties' ESA by actively concealing its policy for more than two years, and refusing to provide FGT with information about the policies FCC now claims satisfied its contractual obligations under the ESA.  Where a party has no knowledge that coverage exists, and no knowledge of how to demand an available defense, it is as if no coverage exists.

## VII.
## PROMISSORY ESTOPPEL

52.     FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

53.     Pleading further, and in the alternative as necessary, FCC is estopped from denying the enforceability of the Notice Agreement.  FCC promised to demand a defense and indemnity from all applicable insurers on behalf of FGT, and FGT reasonably and substantially relied on those promises to its detriment.

54.     FGT's reliance was foreseeable to FCC, as FCC was in possession of information available only to FCC—namely, the certificate(s) of insurance and underlying insurance policy(ies) which FCC now asserts complied with its contractual obligations under the ESA, and which FGT demanded from FCC multiple times without success.

55.     Only after more than a year of such requests, after FGT settled the underlying suit, and after mediating this case did FCC finally disclose even the existence of an insurance policy that it asserted complied with the Parties' ESA.  Further still, it was not until the deposition of FCC's corporate representative that it admitted it never complied with the Notice

Agreement. Under these egregious circumstances, injustice can be avoided only by enforcing FCC's promises to FGT under the Notice Agreement.

56. As a direct and proximate result of FCC's conduct, FGT sustained reliance damages for which it now sues.

## VIII.
## FRAUD

57. FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

58. Pleading further, and in the alternative as necessary, FCC's conduct amounts to nothing short of fraud. On January 30, 2015, FCC represented to FGT that FCC would "immediately demand a defense of FGT from FCC's and Heritage's insurance carriers in connection with the underlying litigation brought by Mr. Villegas." However, FCC apparently made this promise with no intention of performing it. Rather, FCC did the exact opposite—FCC advocated against FGT securing insurance coverage; concealed crucial insurance documents; and misrepresented the actual insurance carriers offering coverage.

59. Indeed, despite having actual knowledge of the Chartis Policy, FCC falsely represented that (i) there were no insurance policies listing FGT as an "additional insured;" and (ii) the only policy potentially offering any form of relief to FGT was an environmental policy issued by Endurance. Despite FCC, upon information and belief, having actual knowledge of the falsity of its representations, FCC failed to simply disclose the truth to FGT—that the Chartis Policy existed; that the Chartis Policy named FGT as an "additional insured"; and that FCC had not and would never "demand a defense of FGT" from Chartis.

60.     FCC made false representations to FGT with the intent that FGT rely upon them. Specifically, FCC hoped FGT would rely on these promises because FCC obtained good and valuable consideration due to FGT's reliance on FCC's statements.

61.     FGT did rely on FCC's representations, and the representations severely damaged FGT by prohibiting FGT from pursuing coverage under what FCC argues is an applicable insurance policy.

## IX.
## BREACH OF FIDUCIARY DUTY

62.     FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

63.     Based upon the Notice Agreement, FCC formally held the position of fiduciary with respect to FGT, owing FGT the duty of loyalty and good faith.  FCC is liable for multiple breaches of its fiduciary duties to FGT.

64.     First and foremost, FCC protected its own interests when communicating with insurance carriers.  Indeed, FCC did not even mention FGT to any insurance carriers except: (a) to essentially advocate against any coverage to FGT in the underlying Villegas Suit; and (b) demanding that insurer carriers defend and indemnify FCC against FGT.  Specifically, FCC requested a defense on its own behalf from insurance carriers—placing FCC's own interests ahead of its duty to protect the interests of FGT.  Additionally, FCC breached its duty of loyalty and good faith to FGT by affirmatively communicating to insurance carriers the meritless factual positions taken by FCC in litigation, which served to prevent and frustrate FGT's standing as an "additional insured."

65.     Further still, despite FGT's repeated requests, FCC refused to provide information concerning all applicable insurance policies, and indeed concealed the very existence of those

policies despite actual knowledge of their existence. Therefore, setting aside FCC's breach of the Notice Agreement for the moment, by refusing to provide information sufficient to identify the carrier of any policy complying with the Parties' Agreement, FCC prevented FGT from immediately demanding a defense and precious indemnity dollars to which, as FCC now argues, FGT was entitled to under the Chartis Policy.

66.     Pleading further and in the alternative if necessary, FCC became FGT's agent by agreeing to demand a defense on behalf of FGT. As its agent, FCC owed FGT a duty of loyalty and good faith. FCC breached its fiduciary duties to FGT by failing to demand a defense of FGT for the Villegas Lawsuit from all insurance carriers. By failing to demand a defense of FGT as agreed, FCC denied FGT access to the insurance coverage to which, as FCC now argues, FGT was entitled.

**X.**
**TORTIOUS INTERFERENCE WITH CONTRACT**

67.     FGT is an "Additional Insured" under the Chartis Policy and therefore, but for FCC's obstructive conduct, would have held standing to request insurance coverage in the underlying Villegas Suit under the Chartis Policy, including its defense costs and indemnification or settlement of the Villegas Suit.

68.     FCC willfully and intentionally interfered with FGT's interest under the Chartis Policy by refusing to provide to FGT the information necessary for FGT to identify the provider and demand a defense, and by simultaneously communicating to insurance carriers FCC's meritless factual positions outlined above which served to prevent and frustrate FGT's right to pursue such insurance coverage.

69.     FCC's actions injured FGT by denying FGT an opportunity to notify insurance carriers until years after service of the Villegas Suit, and only after settlement of the Villegas

Suit.  As such, FGT is entitled to recover from FCC the damages FGT incurred in defending the Villegas Suit, as well as those amounts expended by FGT to settle the claims asserted in the Villegas Suit.

## XI.
## DECLARATORY JUDGMENT

70.     FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

71.     FGT brings this action under the Uniform Declaratory Judgments Act, Texas Civil Practice & Remedies Code § 37.001 *et seq.*  The purpose of the Act is "to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." *Id.* § 37.002(b); *see also Montemayor v. City of San Antonio Fire Dept.*, 985 S.W.2d 549, 551–52 (Tex. App.—San Antonio 1998, no pet.).  The Act provides that a party can seek interpretation of a contract through a request for a declaratory judgment. *See* Tex. Civ. Prac. & Rem. Code § 37.004.

72.     As contemplated by Chapter 37 of the Texas Civil Practice and Remedies Code, an actual and justifiable controversy exists between FGT and FCC regarding FCC's indemnity obligations under the Agreement, including its obligation to defend and indemnify FGT in the Villegas Suit.  A declaratory judgment or decree will resolve the controversy or uncertainty regarding the parties' respective rights and obligations under the Agreement.

73.     FGT contends that the clear and unambiguous terms of the Agreement impose a duty on FCC Environmental to defend and indemnify FGT against Villegas' claims.  FCC, on the other hand, contends that the frac tank and cleaning services provided by FCC, or otherwise its agents and/or sub-contractors, do not constitute "Work" governed by the parties' Agreement,

and therefore do not trigger FCC's contractual obligation to defend and indemnify FGT against the Villegas Suit.

74.     FGT tendered its demand for defense and indemnity pursuant to the terms of the Agreement.  Villegas contends his alleged injuries were sustained in connection with the Work performed by FCC Environmental, or otherwise its agents and/or sub-contractors, for FGT under the parties' Agreement.  Alternatively, FCC allowed APEX/FCC, an entity clothed with indicia of authority to act on behalf of FCC Environmental, to perform "Work" for FCC which is governed by the Agreement between FGT and FCC.  Accordingly, FGT requests that the Court construe the Agreement and enter the following declarations:

a) Pursuant to the Agreement between FGT and FCC Environmental, FCC Environmental performed "Work" as governed by the Agreement by arranging for a frac tank and cleaning services provided to FGT in May 2012;

b) The Accident and the Villegas Suit arise out of "Work" performed by FCC Environmental or its agents and/or sub-contractors under the parties' Agreement (*Agreement* at 19–20, § 18(a));

c) APEX/FCC served as the agent and/or sub-contractor of FCC Environmental for purposes of the Work that led to the Accident and the Villegas Suit;

d) Vann Energy served as a sub-contractor of FCC Environmental for purposes of the Work that led to the Accident and the Villegas Suit;

e) FCC Environmental is required to indemnify FGT for all liability, costs, and attorneys' fees resulting from the Accident and the Villegas Suit, including any liabilty of FGT resulting therefrom (*Agreement* at 19–20, § 18(a));

f) FCC Environmental is required to reimburse FGT for any amount expended by FGT in settling and compromising the Villegas Suit, or for the amount expended by FGT in paying any judgment rendered therein, together with all reasonable attorneys' fees incurred by FGT for defense or settlement of the Villegas Suit (*Agreement* at 20–21, § 18(c));

g) Any judgment rendered against FGT or amount expended by FGT in compromising or settling the Villegas Suit shall be conclusive as determining the amount for which FCC Environmental is liable to reimburse FGT under the Agreement (*Agreement* at 20–21, § 18(c)); and

h)  FCC Environmental shall be liable for all acts and omissions of APEX/FCC and/or Vann Energy or any of its employees or agents, as if performed or omitted by FCC Environmental (*Agreement* at 26, § 34).

## XII.
## ATTORNEYS' FEES

75.     FGT fully incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

76.     In connection with its breach of contract claims, and also pursuant to Chapters 37 and 38 of the Texas Civil Practice & Remedies Code, FGT retained the law firm of Norton Rose Fulbright US, LLP to represent it in this action and has agreed to pay those firms reasonable and necessary attorney's fees.  An award of reasonable and necessary attorney's fees to FGT would be equitable and just and therefore authorized under Texas law, including Chapters 37 and 38 of the Texas Civil Practice & Remedies Code and the terms of the Parties' Agreement.

## PRAYER

For these reasons, Florida Gas Transmission Company, LLC requests that Defendant FCC Environmental, LLC be cited to appear and answer these allegations, and on final trial, that judgment be entered in favor of Plaintiff for the following:

1.  All actual and consequential damages arising from FCC's material breaches of the Parties' Environmental Services Agreement;

2.  All actual and consequential damages arising from FCC's material breaches of the Parties Notice Agreement;

3.  All actual and consequential damages arising from FCC's breach(es) of their fiduciary duties;

4.  That FCC be estopped from denying the existence and enforceability of the Notice Agreement, and that FGT be awarded its reliance damages equal to the amount of the reasonable and necessary defense costs incurred to defend the underlying Villegas Suit, as well as the reasonable settlement value paid by FGT to settle the underlying Villegas Suit;

5. Exemplary damages for FCC's fraud and breaches of FCC's fiduciary duties to FGT pursuant to Texas Civil Practice & Procedure Code § 41.003(a);

6. All actual and consequential damages arising from FCC's tortious interference with FGT's interests under the Chartis Policy;

7. Declarations that:

   (a) Pursuant to the Agreement between FGT and FCC Environmental, FCC Environmental performed "Work" as governed by the Agreement by providing, or arranging for the provision of, a frac tank and cleaning services to FGT in May 2012;

      i. APEX/FCC served as the agent and/or sub-contractor of FCC Environmental for purposes of the Work giving rise to the Accident and the Villegas Suit;

      ii. Vann Energy served as a sub-contractor of FCC Environmental for purposes of the Work giving rise to the Accident and the Villegas Suit;

   (b) The Accident and the Villegas Suit arise out of "Work" performed by FCC Environmental or its agents and/or sub-contractors under the parties' Agreement (*Agreement* at 19–20, § 18(a));

   (c) FCC Environmental is required to indemnify FGT for all liability, costs, and attorneys' fees resulting from the Accident and the Villegas Suit, including any liability of FGT resulting therefrom (*Agreement* at 19–20, § 18(a));

   (d) FCC Environmental is required to reimburse FGT for any amount expended by FGT in settling and compromising the Villegas Suit, or for the amount expended by FGT in paying any judgment rendered therein, together with all reasonable attorneys' fees incurred by FGT for defense or settlement of the Villegas Suit (*Agreement* at 20–21, § 18(c));

   (e) Any judgment rendered against FGT or amount expended by FGT in compromising or settling the Villegas Suit shall be conclusive as determining the amount for which FCC Environmental is liable to reimburse FGT under the Agreement (*Agreement* at 20–21, § 18(c)); and

   (f) FCC Environmental shall be liable for all acts and omissions of APEX/FCC and/or Vann Energy or any of its employees or agents, as if performed or omitted by FCC Environmental (*Agreement* at 26, § 34);

8. Pre-judgment interest as provided by law;

9. Attorneys' fees and expenses incurred in having to pursue the present lawsuit against FCC;

---

10. Costs of suit; and

11. Such other and further relief to which FGT may be justly entitled.

Dated: October 17, 2016                    NORTON ROSE FULBRIGHT US, LLP


                                           /s/ John R. Herring
                                           Richard S. Krumholz
                                           State Bar No.  00784425
                                           richard.krumholz@nortonrosefulbright.com
                                           John R. Herring
                                           State Bar No.  24065410
                                           john.herring@nortonrosefulbright.com

                                           2200 Ross Avenue, Suite 3600
                                           Dallas, TX  75201-7932
                                           Telephone:      (214) 855-8000
                                           Facsimile:      (214) 855-8200

                                           *Attorneys for Plaintiff Florida Gas Transmission
                                           Company, LLC*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on October 17, 2016.

T. Micah Dortch
Cooper & Scully, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
214-712-9500
fax:  214-712-9540
micah.dortch@cooperscully.com

Christopher D. Lindstrom
Cooper & Scully, P.C.
815 Walker Street, Suite 1040
Houston, Texas 77002
713-236-6800
fax:  713-236-6880
chris.lindstrom@cooperscully.com

Kent M. Adams
Marjorie L. Cohen
Wilson, Elser, Moskowitz, Edelman & Dicker
909 Fannin Street, Suite 3300
Houston, TX  77010
fax:  713-785-7780
kent.adams@wilsonelser.com
marjorie.cohen@wilsonelser.com

*/s/ John R. Herring*
John R. Herring